MURDOCK, Justice
(dissenting).
There is no good outcome in this case. In fairness to the main opinion, this Court has been put in a position from which it cannot give an answer that yields a just result for both plaintiffs and defendants in cases such as this. My understanding of certain bedrock principles of tort law and of the economic realities underlying those principles, however, compels me to dissent and to explain fully my concerns.
I.
A.
From the beginning, what Alexander Hamilton referred to as “[t]he spirit of enterprise, which characterizes the commercial part of America,”[21] has animated Americans to work hard to produce innovative goods and services that have benefited not only themselves, but also their children, their communities, and America as a whole. An enterprising spirit alone, however, is not enough. The law must protect the fruits of enterprise and create a climate in which trade and business innovation can flourish. Concomitantly, the law must justly allocate risks that are a function of that free trade and innovation.
These dual needs have resulted in an economic and legal system that always has coupled the rewards from the sale of a good or service with the costs of tortious injury resulting from the same. Indeed, this and the corollary notion that parties *685 are responsible for their own products, not those of others, are so organic to western economic and legal thought that they rarely find need of expression.
The path the Court takes today is in conflict with these notions. Impetus to take this path comes from a newfound and admittedly legitimate concern left in the wake of the United States Supreme Court’s holding in PLIVA, Inc. v. Mensing, 564 U.S. -, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011), that state-law tort claims against manufacturers of generic drugs are preempted by federal law. The resulting concern is that, if manufacturers of brand-name drugs are not responsible under state law for injuries caused by defects in generic drugs and their related labeling, then no one will be.
To see our way clear to placing such responsibility upon brand-name manufacturers, however, we must distance our-, selves from the foregoing notions. We must overlook a foundational element of tort law that these notions inform and in which they find voice: the necessity of a “duty” arising from a sufficient “relationship,” or nexus, between the injured party and the defendant. We must focus on the role of “foreseeability” in the creation of a duty to the exclusion of “relationship.” In doing so, this Court creates a precedent that poses danger for the prescription-medicine industry and, by extension, for all industry.
B.
As discussed in Part II of this writing, almost every one of the 47 reported cases decided before the United States Supreme Court’s decision in PLIVA, including cases decided by two United States Circuit Courts of Appeals, held that a manufacturer of a brand-name drug has no duty to the consumer of a generic drug manufactured and sold by another company. Since the Supreme Court’s 2011 decision in PLI-VA, every one of the two dozen cases that have addressed the issue, including decisions by six United States Circuit Courts of Appeals, has reached this same conclusion.
As these numbers indicate, the Supreme Court’s holding in PLIVA — that state-law claims against generic-drug manufacturers are preempted by the federal regulatory scheme — did nothing to undermine the essential rationale in the plethora of pre- and post-PLIVA decisions holding that brand-name manufacturers are not liable for injuries caused by deficient labeling of generic drugs they neither manufactured nor sold. In fact, as discussed below, the opinion in PLIVA expressly says as much, and opinions in post-PLIVA cases are even more explicit in saying so.
It does indeed appear unfair — an “unfortunate hand” in the words of the United States Supreme Court — that a consumer harmed by a generic drug cannot seek compensation from the entity that manufactured and sold that drug. If this is unfair, however, it is an unfairness created by Congress and the Food and Drug Administration (“the FDA”) in return for the perceived societal benefit of less expensive generic drugs, or perhaps instead by the manner in which the United States Supreme Court subsequently has applied the preemption doctrine to the legislative and regulatory scheme structured by those entities. It is not an unfairness created by the brand-name manufacturer. The just answer then, if there is to be one, must come from a change of federal policy or preemption jurisprudence. It is not to come from ignoring age-old, elemental precepts of tort law in order to impose liability on an entity with whom the plaintiff has no relationship, in regard to a product that that entity did not manufacture or sell.
*686 Having itself laid the blame for the present unfairness at the feet of Congress and the FDA, the United States Supreme Court concludes in PLTVA that this is not a problem for that Court to correct. If this is so, then, a fortiori, it is not a problem for this or any other state court to correct. And it certainly is not a “wrong” that this or any court should attempt to correct with a second “wrong.”
II.
“The concept of duty does not exist in a vacuum.” State Farm Fire & Cas. Co. v. Owen, 729 So.2d 834, 839 (Ala.1998). It requires a sufficient “relationship,” or nexus, between two or more parties. Id. The duty this Court recognizes today is one based solely on “foreseeability.” Given the existing federal regulatory scheme, I agree that it is “foreseeable” — indeed, eminently so — that a generic version of a brand-name drug will be consumed in reliance upon labeling disseminated by the brand-name manufacturer for its brand-name drug. But this foreseeability alone is not enough to create a duty. There also must be a “relationship” or nexus between the parties.
For example, it might be foreseeable that one manufacturer would copy the design of an unpatented machine of some nature, which, unbeknownst to that manufacturer, was originally designed in a defective manner, and that a user of the copied device might be injured as a result of a replicated design defect. Nonetheless, the designer of the original machine did not manufacture or sell the copied machine. The law therefore recognizes the lack of any nexus between that designer and the injured party in relation to the machine that caused the injury and thus recognizes no duty on the part of that designer to the injured party.
The same principle applies to claims of misrepresentation and suppression. A viable claim depends upon the existence of a duty on the part of the defendant to the plaintiff. See, e.g., Nesbitt v. Frederick, 941 So.2d 950, 955 (Ala.2006) (“An essential element of fraudulent-misrepresentation and fraudulent-suppression claims is a duty to disclose.”).
In Thompson-Hayward Chemical Co. v. Childress, 277 Ala. 285, 291-92, 169 So.2d 305, 312 (1964), the Alabama Supreme Court addressed a common-law claim alleging failure to warn of the dangerous nature of a herbicide:
“The breach of duty charged against defendants is the failure to give notice to or warn plaintiffs of the dangerous nature of the vine killer. Do the facts alleged in the complaint show that the defendant, Bertolla, owed a duty to warn plaintiffs? As plaintiffs candidly admit in brief, it is not alleged that plaintiffs purchased the vine killer from Bertolla. It is not alleged that Bertolla ever had possession of or any connection whatsoever with the particular substance which plaintiffs sprayed and which allegedly caused the death of plaintiffs’ cattle. The rule, upon which plaintiffs’ right to recover is based, imposes the duty on one who, with knowledge of its dangerous quality, manufactures or sells an imminently dangerous article and fails to warn. It is not alleged that Bertolla manufactured the dangerous article. It is' not alleged that Bertolla sold it. How, then, did Bertolla owe a duty to warn? ”
(Emphasis added.)
In a case in which it was foreseeable to the owner of a power pole that a defective power line hanging from its pole could injure someone in the plaintiffs position, this Court held that the lack of any relationship between the owner of the power *687 pole and the injured party meant that no duty to warn of the danger existed:
“In addition to foreseeability, Alabama courts look to a number of factors to determine whether a duty exists, including ‘ “(1) the nature of the defendant’s activity; (2) the relationship between the parties; and (3) the type of injury or harm threatened.” ’ Taylor [v. Smith], 892 So.2d [887,] 892 [ (Ala.2004) ] (quoting Morgan v. South Cent. Bell Tel. Co., 466 So.2d 107,114 (Ala.1985)).
“[The plaintiff] argues that ‘once [Joe Wheeler Electric Membership Corp.] had actual or constructive knowledge of the deadly hazard, it had a duty to require the removal of the hazard,’ and she asserts that ‘notice or knowledge of a dangerous condition can give rise to a duty of care.’ [Plaintiffs] brief at 29 (citing [Alabama Power Co. v.] Cantrell, 507 So.2d [1295,] 1297 [(Ala.1986)] (‘ “ ‘The duty of an electric company, in conveying a current of high potential, to exercise commensurate care under the circumstances, requires it to insulate its wires, and to use reasonable care to keep the same insulated wherever it may reasonably be anticipated that persons, pursuing business or pleasure, may come in contact therewith.’ ” ’ (quoting [Alabama Power Co. v.] Brooks, 479 So.2d [1169,] 1172 [ (Ala.1985) ], quoting in turn Bush [v. Alabama Power Co.], 457 So.2d [350,] 853 [ (Ala.1984) ]))).
“The holding of Cantrell is not as broad as [the plaintiff] posits. Cantrell imposes a specific duty on utilities to insulate their own lines, in specific circumstances, whenever it is reasonably anticipated that people may come into contact with those lines. 507 So.2d at 1297. Although the duty imposed on the utility companies in Cantrell is triggered when the utility company is aware that individuals may come in contact with its lines, Cantrell does not stand for the proposition that notice of a dangerous condition alone is sufficient to give rise to a duty of care. Further, none of the other cases cited by DiBiasi support her position. See ... Dominiei v. Wal-Mart Stores, Inc., 606 So.2d 555, 559 (La.Ct.App.1992) ([stating that] ... ‘[a]ctual or constructive knowledge of a risk or injury gives rise to a duty to take reasonable steps to protect against injurious consequences resulting from the risk,’ but noting that ‘whether a legal duty is owed by one party to another depends upon the facts and circumstances of the case and the relationship of the parties ....’) ...; cf. Alabama Dep’t of Corr. v. Thompson, 855 So.2d 1016, 1021-22, 1025 (Ala.2003) (noting that ‘ “ ‘[i]t is the general rule in Alabama that absent special relationships or circumstances, a person has no duty to protect another from criminal acts of a third party’ ” ’ (quoting Hail v. Regency Terrace Owners Ass’n, 782 So.2d 1271, 1274 (Ala.1999), quoting in turn Moye v. A.G. Gaston Motels, Inc., 499 So.2d 1368, 1372 (Ala.1986)), and holding that ‘state correctional officers owe a general duty to the public, not a duty to a specific person, to maintain custody of inmates’).

“Although it may be true that foreseeability is a key factor in determining whether a duty exists in a particular circumstance, and knowledge of a dangerous condition may establish foreseeability, Alabama caselaw does not hold that knowledge, by itself, is sufficient to impose a duty.”

DiBiasi v. Joe Wheeler Elec. Membership Corp., 988 So.2d 454, 461-62 (Ala.2008) (emphasis added; footnote omitted). See also, e.g., David G. Owen et al., Madden & Owen on Products Liability § 2:9 (3d ed. 2000) (“As is true in tort law generally, foreseeability, although necessary, is not in *688 itself a sufficient criterion for negligence in products liability cases.”).[22]
Prescription-Drug Cases Decided Before PLIVA
In the leading case involving the question of liability on the part of the manufacturer of a brand-name drug for harm caused by deficient labeling of the generic version of the drug, the United States Court of Appeals for the Fourth Circuit recognized not only the necessity of a duty owed by the defendant to the plaintiff, but also that the source of that duty must be a relationship created by the plaintiffs consumption of the defendant’s product. In Foster v. American Home Products Corp., 29 F.3d 165, 167 (4th Cir.1994), the Court expressly held that “a name brand manufacturer cannot be held liable on a negligent misrepresentation theory for injuries resulting from use of another manufacturer’s product.”
The plaintiffs attempt to discount Foster and other cases that reach the same conclusion. According to the plaintiffs, the opinions in those cases were based on the assumption that generic manufacturers were available to bear the liability for any deficiencies in the labeling that accompanies their products. Such an assumption, they note, is no longer viable in light of the Supreme Court’s decision in PLPVA
The issue of the generic manufacturer’s liability, however, was not the issue in Foster and the dozens of similar cases decided before PLIVA. Although the courts in some of those cases might have taken some comfort in the availability of a generic manufacturer as a responsible party, the conclusion reached by the Foster court and other courts as to the lack of liability on the part of brand-name manufacturers for injuries caused by deficient labeling of generic drugs was not dependent upon that availability. Thus, after expressing in dicta its views as to the potential liability of generic manufacturers, the Foster court proceeded to explain separately as follows:
“We also reject the contention that a name brand manufacturer’s statements regarding its drug can serve as the basis for liability for injuries caused by another manufacturer’s drug. Name brand manufacturers undertake the expense of developing pioneer drugs, performing the studies necessary to obtain premark-eting approval, and formulating labeling information. Generic manufacturers avoid these expenses by duplicating successful pioneer drugs and their labels. Name brand advertising benefits generic competitors because generics are generally sold as substitutes for name brand *689 drugs, so the more a name brand drug is prescribed, the more potential sales exist for its generic equivalents. There is no legal precedent for using a name brand manufacturer’s statements about its own product as a basis for liability for injuries caused by other manufacturers' products, over whose production the name brand manufacturer had no control. This would be especially unfair when, as here, the generic manufacturer reaps the benefits of the name brand manufacturer’s statements by copying its labels and riding on the coattails of its advertising. The premarketing approval scheme Congress established for generic equivalents of previously approved drugs cannot be construed to create liability of a name brand manufacturer when another manufacturer’s drug has been consumed.”
29 F.3d at 170 (emphasis added).
Furthermore, in a separate portion of its opinion, the court explains unequivocally, and without any reference to the prospects for liability on the part of the generic manufacturer, that a brand-name manufacturer simply has no “duty” to the consumer of a generic drug the brand-name manufacturer did not produce or distribute and that, therefore, the brand-name manufacturer cannot be liable under a negligent-misrepresentation theory:
“The Fosters’ negligent misrepresentation action against Wyeth also fails because Wyeth is under no duty of care to the Fosters.... An action for negligent misrepresentation will not lie unless the defendant owes the plaintiff a duty of care. Weisman v. Connors, 812 Md. 428, [442-47,] 540 A.2d 783, 790-92 (1988).”
29 F.3d at 171. The court then expressly rejects the same foreseeability argument urged upon us by the plaintiffs in this case, explaining that foreseeability alone is not enough to create a duty and that a relationship between the parties is necessary:
“The Fosters contend that a duty exists in this case because it was foreseeable to Wyeth that misrepresentations regarding Phenergan could result in personal injury to users of Phenergan’s generic equivalents. They point to Jacques v. First National Bank, a negligence action, which noted:
“Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent. By contrast, where the risk created is one of personal injury, no such direct relationship need be shown, and the principal determinant of duty becomes foreseeability.’
“307 Md. 527, [534-35,] 515 A.2d 756, 759-60 (1986). We think to impose a duty in the circumstances of this case would be to stretch the concept of foreseeability too far. The duty required for the tort of negligent misrepresentation arises when there is ‘such a relation that one party has the right to rely for information upon the other, and the other giving the information owes a duty to give it with care.’ Weisman v. Connors, 312 Md. 428, 540 A.2d [783] at 790 [ (1988) ] (quoting Holt v. Kolker, 189 Md. 636, [640,] 57 A.2d 287, 288 (1948)). There is no such relationship between the parties to this case, as Brandy Foster was injured by a product that Wyeth did not manufacture. As Wyeth has no duty to the users of other manufacturers’products, a negligent misrepresentation action cannot be maintained against it on the facts of this case.”
29 F.3d at 171 (emphasis added).
*690 By my count,[23] from the time Foster was decided until the issuance of the Supreme Court’s decision in PLIVA, 48 reported cases applying the law of 18 states were decided in accordance with the Foster decision.[24] Aside from the decision of the *691 court certifying the question in this case, only two courts held to the contrary — an intermediate state appeals court in California and a district court in Vermont.[25]
The United States Court of Appeals for the Eighth Circuit is the court from which the PLIVA case came and to which it was returned on remand by the United States Supreme Court. See Mensing v. Wyeth, Inc., 588 F.Bd 603, 612-14 (8th Cir.2009), rev’d in part on other grounds sub nom., PLIVA, Inc. v. Mensing, 564 U.S. -, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011). Before the Supreme Court weighed in, the Eighth Circuit Court of Appeals held that state-law claims against generic-drug manufacturers were not preempted by federal law. 588 F.3d at 611. In the same opinion, however, that court was called upon to decide whether a brand-name manufacturer could be held liable for injuries caused by generic metoclopramide manufactured and sold by another party. In a soundly reasoned opinion, that court answered in the negative:
“[RJegardless of whether her doctor relied upon the Reglan label, Mensing must show that the name brand manufacturers owed her a duty of care. Duty is a threshold requirement for all of the tort claims Mensing asserts. See, e.g., Noble Systems Corp. v. Alorica Central, LLC, 543 F.3d 978, 985 (8th Cir.2008) (finding that under Minnesota law negligent misrepresentation requires the plaintiff to ‘prove some relationship that is sufficient to create a duty owed by the defendant to the plaintiff’).
“Such a duty of care does not extend to all potential Reglan consumers. ‘Minnesota common law ... requires a stronger relationship and a direct communication.’ Flynn [v. American Home Prods. Corp.], 627 N.W.2d [342,] 350 [ (Minn.Ct.App.2001) ]. Since Mensing ‘did not purchase or use [the name brand defendants’] product, ... there was no direct relationship between them, let alone a fiduciary relationship that gave rise to a duty.’ Id. at 350. Mensing focuses on the foreseeability of harm from the defendants’ action. Like the Fourth Circuit, we conclude that holding name brand manufacturers liable for harm caused by generic manufacturers ‘stretch[es] the concept of foreseeability too far. ’ Foster, 29 F.3d at 171.”
588 F.3d at 613-14 (some emphasis added; footnote omitted).
In a footnote, the Eighth Circuit also provided this instructive insight:
*692 “Mensing’s attempt to characterize her fraud claim as a type requiring no proof of a duty of care is unavailing. A plaintiff claiming fraud in Minnesota must show that the defendant intended to induce another to act in reliance on its fraudulent statement. Specialized Tours, Inc. v. Hagen, 892 N.W.2d 520, 582 (Minn.1986). Mensing’s relationship with the Reglan manufacturers is too attenuated, and she has cited no Minnesota case in which the court imposed liability for fraud on a defendant who did not intend to communicate with the plaintiff. The Reglan manufacturers intended to communicate with their customers, not the customers of their competitors.”
588 F.3d at 613 n. 9 (emphasis added).
Among the other pre-PLTVA decisions are four decisions from federal district courts in Alabama applying Alabama law: Mosley v. Wyeth, Inc., 719 F.Supp.2d 1340 (S.D.Ala.2010); Simpson v. Wyeth, Inc., No. 7:10-CV-01771-HGD (N.D.Ala. Dec. 9, 2010) (not reported in F.Supp.2d); Overton v. Wyeth, Inc., No. CA 10-0491-KD-C (S.D.Ala. Mar. 15, 2011) (not reported in F.Supp.2d); and Barnhill v. Teva Pharm. USA, Inc., No. 06-0282-CB-M (S.D.Ala.2007) (not reported in F.Supp.2d). In all four of these cases, the court held that claims could not be maintained under Alabama law against the manufacturer of a brand-name drug for injuries resulting from a consumer’s use of a generic version of that drug manufactured and sold by another company. The first of these, Mosley, is representative of the other Alabama federal district court decisions, as well as the other district court decisions identified above. As the federal district court in Mosley explained regarding precisely the same drug, the same defendants, and the same legal issue as are presented in the case at hand:
“The argument is not that Defendants’ product caused Plaintiff harm, but rather that their dissemination of false and misleading information, which they knew would be relied upon by the generic manufacturers in generating their own labels, was the direct and proximate cause of Plaintiffs injuries.”
719 F.Supp.2d at 1344-45. The court rejected this argument because, under Alabama law, no “relationship” existed between the manufacturer of the brand-name drug and the consumer of the generic drug, and thus no “duty” was owed. 719 F.Supp.2d at 1346-47.
Contrary to the main opinion, but consistent with all the foregoing authority, Wyeth’s argument does not “ignore[ ] the nature of prescription medication.” 159 So.3d at 674. Obviously, a duty must be understood to run from a drug manufacturer to a consumer if that consumer is to be able to state a claim against the manufacturer. (If the duty ran only to an intermediary or other third party, such as a physician or pharmacist, then only the intermediary or third party would have a cause of action and be a proper plaintiff.) The controlled nature of prescription drugs, see 21 U.S.C. § 353(b)(1), simply means that the drug manufacturer fulfills its duty of disclosure to the consumer by making disclosures to the consumer’s physician and/or pharmacist, who receives the disclosures and acts upon them on behalf of the consumer. In essence, the consumer’s physician serves as the agent of the consumer for purposes of receipt of and reliance upon the disclosures, or omissions, of the manufacturer. See, e.g., Stone v. Smith, Kline & French Labs., 447 So.2d 1301, 1305 (Ala.1984) (quoting Reyes v. Wyeth Labs., 498 F.2d 1264, 1276 (5th Cir.1974)):
“ ‘As a medical expert, the prescribing physician can take into account the pro *693 pensities of the drug as well as the susceptibilities of his patient. His is the task of weighing the benefits of any medication against its potential dangers. The choice he makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative. Pharmaceutical companies then, who must warn ultimate purchasers of dangers inherent in patent drugs sold over the counter, in selling prescription drugs are required to warn only the prescribing physician, who acts as a “learned intermediary” between manufacturer and consumer.’ ”
(Emphasis added.)[26]
Wyeth’s position fully accommodates the notion that a prescription drug is consumed only if it is prescribed by a physician and dispensed by a pharmacist, and that the physician and pharmacist act as agents of the consumer of a generic drug for purposes of receiving and acting upon whatever warnings and representations the drug’s manufacturer intends for that consumer. The fact that there is such a “learned intermediary” acting in this manner on behalf of the ultimate consumer does not in itself create a relationship between the brand-name manufacturer and the consumer. Regardless of the fact of, or content of, a given prescription, if a person consumes a generic drug, the nexus created is with the manufacturer of the generic drug. The physician’s involvement does nothing to create some sort of relationship between the consumer and some different entity. The consumer has no more relationship with the brand-name manufacturer in such a scenario than he or she would have if the learned intermediaries were not involved and the consumer purchased the generic drug directly from the generic manufacturer.
As the Eighth Circuit Court of Appeals indicated in Mensing, perhaps there is confusion resulting from the fact that, in prescribing or dispensing a generic drug, physicians or pharmacists might in fact rely upon labeling that previously was published by a brand-name manufacturer in conjunction with the marketing by it of its own brand-name drug. As that court also pointed out, however, the labeling of the brand-name manufacturer is not intended for that purpose; it is published by the brand-name manufacturer solely for the purpose of fulfilling the brand-name manufacturer’s own duty to provide adequate labeling to the consumers of its product. To say that a physician’s or pharmacist’s reliance upon a brand-name manufacturer’s labeling in prescribing or dispensing a generic drug makes the brand-name manufacturer liable for injuries suffered by the generic-drug consumer is to “bootstrap” into existence a duty on the part of *694 the brand-name manufacturer to that consumer; the first inquiry must be whether the brand-name manufacturer had a duty to one who did not consume its product to publish adequate labeling. Apart from such bootstrapping, there is no basis to declare the existence of such a duty. See, e.g., Mensing, 588 F.3d at 613 (“Regardless of whether her doctor relied upon the Reglan label, Mensing must show that the name brand manufacturers owed her a duty of care.”).[27]
The present case is not distinguishable from the above-discussed cases on the ground that the present case involves common-law claims of fraud in relation to deficient labeling. Foster, the Eighth Circuit Court of Appeals’ Mensing case, Alabama federal district court decisions such as Mosley, and dozens, of other well considered decisions cited above involve alleged defects in labeling. Indeed, many, if not most, of them involve common-law claims of misrepresentation of some sort. They consider, and often explain, the necessity of a duty arising from a relationship as no less applicable to claims of defects in the warnings that accompany a product than to defects in the pharmacology of the product.[28]

*695
PLTVA

On June 28, 2011, the United States Supreme Court decided PLIVA. The Court held that state tort-law claims against manufacturers of generic drugs were preempted by the statutory and regulatory scheme that had been adopted by Congress and the FDA. 564 U.S. at-, 131 S.Ct. at 2581-82. It is clear from the text of the PLTVA opinion itself that PLI-VA did not undermine the rationale of the dozens of pre-PLTVA decisions discussed and cited above.
Foremost in this regard is the simple fact that the issue discussed in PLTVA was the effect of the federal law of preemption on the liability of generic manufacturers for their own drugs. Nothing in the Court’s reasoning as to this issue has any bearing on the unrelated question under state law of relationship and duty of brand-name manufacturers with respect to drugs they do not manufacture.
Second, the PLIVA Court includes statements in the opinion that contemplate that its ruling as to generic manufacturers does not mean that consumers injured by generic drugs will now be able to turn to manufacturers of brand-name drugs for compensation. The Supreme Court expressly recognizes the “unfortunate hand” that has been dealt to consumers of generic drugs given its decision:
“We acknowledge the unfortunate hand that federal drug regulation has dealt Mensing, Demahy, and others similarly situated.
“But ‘it is not this Court’s task to decide whether the statutory scheme established by Congress is unusual or even bizarre.’ Cuomo v. Clearing House Assn., L.L.C., 557 U.S. 519, 556 (2009) (THOMAS, J., concurring in part and dissenting in part) (internal quotation marks and brackets omitted).”
564 U.S. at-, 131 S.Ct. at 2581-82. As Justice Sotomayor subsequently explained, under the majority decision, a consumer of a generic drug “now has no right to sue.” 564 U.S. at-, 131 S.Ct. at 2592 (Soto-mayor, J., dissenting).
Moreover, the Supreme Court expressed its understanding that the consumption of the brand-name manufacturer’s drug remained a prerequisite to holding that manufacturer hable for a labeling deficiency: “Had Mensing and Demahy taken Reglan, the brand-name drug ..., Wyeth [v. Le *696 vine, 555 U.S. 555 (2009),[29] would control and their lawsuits would not be pre-empt-ed.” 564 U.S. at-, 131 S.Ct. at 2581.
Cases Decided in the Wake of PLIVA
In the year and a half after PLIVA was decided, but before this Court issued its opinion on original submission in this case, 11 decisions applying the law of 10 states were reported. Every one of those decisions held that manufacturers of brand-name drugs had no duty or liability to the consumer of a generic drug manufactured and sold by another company.[30] Accordingly, there was (and, as will be seen, still is) unanimity among the courts that addressed the question in the wake of PLI-VA that the holding of PLIVA as to the preemption of state-law claims against generic manufacturers does not undermine the rationale of the pre-PLIVA decisions discussed above or justify making brand-name manufacturers liable for a product they have not manufactured or sold. This includes each of the three United States Courts of Appeals to address the issue in the first year and a half following PLI-VA — the Courts of Appeals for the Fifth, Sixth, and Eighth Circuits.
Perhaps the most noteworthy of the aforesaid three Court of Appeals’ decisions was the short order issued on remand by the Eighth Circuit Court of Appeals in the PLIVA case itself. The same court whose judgment had just been reversed by the United States Supreme Court on the issue of preemption as to the liability of generic manufacturers evidently felt no compunction in deciding expressly to “reinstate Section III of [its original] opinion,” the same section quoted at length above in which it had held that brand-name manufacturers were not liable for defects or deficiencies in the labeling of products manufactured and sold by others. Mensing v. Wyeth, Inc., 658 F.3d 867 (8th Cir.2011).
In Smith v. Wyeth, Inc., 657 F.3d 420 (6th Cir.2011), the United States Court of Appeals for the Sixth Circuit also acknowledged, but was unaffected by, the holding in PLIVA. The court began by noting the applicability of the Kentucky Products Liability Act, which, it explained, was merely a codification of preexisting common-law principles, including common-law principles regarding the misrepresentation and “failure-to-warn” claims asserted against the manufacturers of brand-name drugs in that case. 657 F.3d at 423.[31] The court *697 then proceeded, undeterred in any way by the PLIVA holding as to manufacturers of generic drugs, to explain its rejection of the misrepresentation claims against the brand-name manufacturer, Wyeth, as to the same drug that is at issue here:
“A threshold requirement of any products-liability claim is that the plaintiff assert that the defendant’s product caused the plaintiffs injury. See Holbrook v. Rose, 458 S.W.2d 155, 157 (Ky.1970). The plaintiffs in this case concede that they had consumed only generic versions of metoclopramide and not Reglan. As the district court observed, adopting their theory of liability would require the court to attribute any deficiency in a name-brand manufacturer’s labeling and marketing of its products to products manufactured by its generic competitors. Such a theory, however, fails to satisfy the threshold requirement of a products-liability action — that the defendant’s product have injured the plaintiff. As the district court stated, ‘Just because a company is in the same business as a tortfeasor, the company is not automatically liable for the harm caused by the tortfeasor’s product.’
“The plaintiffs’ argument — that the name-brand defendants’ liability stems from the fact that the regulatory structure governing name-brand and generic drugs makes it foreseeable that patients and their physicians will rely on the name-brand labels to use and prescribe generic drugs — has been rejected by all but one of the courts that have considered it. The leading case is Foster v. American Home Products Corp., 29 F.3d 165 (4th Cir.1994), in which the court held that the manufacturer of a name-brand drug has no duty to patients who ingested only a generic version of the drug manufactured by the name-brand drug company’s competitors. ... As have the majority of courts to address this question, we reject the argument that a name-brand drug manufacturer owes a duty of care to individuals who have never taken the drug actually manufactured by that company.”
657 F.3d at 423-24 (some emphasis added).
In the last of the aforesaid decisions by federal courts of appeals, the United States Court of Appeals for the Fifth Circuit explicitly held in Demahy v. Schwarz Pharma, Inc., 702 F.3d 177, 184 (5th Cir. 2012), that PLIVA changed nothing as to brand-name manufacturers:
“We do not view {PLIVA ] as overruling Foster [v. American Home Products Corp., 29 F.3d 165 (4th Cir.1994),] because the court in Foster did not reach its holding by relying on the ability of a plaintiff to sue generic manufacturers. *698 Instead, the court’s holding was based on its interpretation of Maryland law and the conclusion that a name-brand manufacturer has no duty of care to consumers that are not using the manufacturer’s product. Foster, 29 F.3d at 171-72; see also Smith v. Wyeth, 657 F.3d 420, 423-24 (6th Cir.2011) (following Foster’s conclusion that name-brand manufacturers have no duty to generic-brand consumers). The Foster court’s opinion in dicta on the viability of suits against generic manufacturers was proved wrong, but this fact does not impose on name-brand manufacturers a duty of care to customers using generic products.”
In Phelps v. Wyeth, Inc., 857 F.Supp.2d 1114 (D.Or.2012), the federal district court for Oregon also explicitly rejected the notion that PLIVA changed anything as to brand-name manufacturers. In an opinion reflective of the other post-PLPVA decisions by federal district courts, it explained:
“[Wjhile [PLIVA ] overrules Foster [v. American Home Products Corp., 29 F.3d 165 (4th Cir.1994),] with respect to a generic manufacturer’s ability to alter labels, it does not overrule Foster’s holding regarding the liability of name-brand manufacturers. Indeed, the Foster court’s reluctance to hold name-brand defendants liable for generic drugs did not depend on a generic manufacturer’s ability to alter the label, but rather on concepts of foreseeability and duty. Consequently, [PLIVA] does not overturn the central holding in Foster.”
857 F.Supp.2d at 1119 (emphasis added).
The Oregon court provided an instructive analysis as to the necessity of a relationship in order for there to exist a duty for purposes of a common-law claim based on deficient labeling of drugs:
“It is undisputed that Mrs. Phelps never ingested metoclopramide manufactured by any of the name-brand defendants .... Under Oregon’s product liability law, the name-brand defendants cannot be found liable for plaintiffs’ injuries because plaintiffs cannot show that their injuries resulted from the use of the name-brand manufacturers’ product. See McEwen v. Ortho Pharma. Corp., 270 Or. 375, 407, 528 P.2d 522 (1974). Nonetheless, plaintiffs request that the court apply common law principles of negligence, fraud, and misrepresentation to extend liability to the name-brand defendants. They argue that regardless of whether Mrs. Phelps ingested the name-brand defendants’ product, the name-brand defendants owed, her a duty of care.
“Plaintiffs cite neither Oregon nor federal law to support this proposition. Instead, plaintiffs argue that manufacturers owe a general duty to use care in connection with their conduct to all who may [be] injured by it, if such conduct is carried out in a negligent manner and results in foreseeable injuries.... (citing Palsgraf v. Long Island R.R. Co., 248 N.Y. 339, 162 N.E. 99 (1928)). Plaintiffs assert that, based on federal regulations, name-brand defendants should have known that all generic manufacturers were required to duplicate the information on name-brand labels for generic drugs, and that generic manufacturers were prevented from including additional warnings or independently warning doctors of metoclo-pramide’s risks. Additionally, plaintiffs argue that name-brand defendants knew or should have known that their label did not adequately warn of the risks associated with metoclopramide. Consequently, plaintiffs assert that the generics defendants’ reliance on name-brand *699 defendants’ labels was a foreseeable cause of their injuries.
“... [In Foster v. American Home Products Corp., 29 F.3d 165 (4th Cir. 1994),] [t]he plaintiffs brought suit against the name-brand manufacturer for negligent misrepresentation, but the Fourth Circuit ruled that Maryland law did not allow a manufacturer to be liable for an injury caused by a competitor’s product. Id. at 171. While Foster recognized that reliance on the label was foreseeable, the court explained that foreseeability alone does not create a duty of care, and the court specifically rejected the plaintiffs’ negligence claim. Id .... The Foster court found that there is ‘(n)o legal precedent for using a name brand manufacturer’s statements about its own product as a basis for liability [for] injuries caused by other manufacturers’ products, over whose production the name brand manufacturer had no control.’ Id. at 170. Name-brand defendants cite a plethora of courts which have followed Foster and concluded that name-brand defendants cannot be held liable for injuries caused by products produced by a generic manufacturer. See e.g. Smith v. Wyeth, Inc., 657 F.3d 420, 424 (6th Cir.2011); Metz v. Wyeth LLC, 830 F.Supp.2d 1291 (M.D.Fla.2011).”
857 F.Supp.2d at 1120-21 (emphasis added).
Finally, the Oregon court expressed the same understanding of the text of the PLI-VA decision that is offered above:
“In fact, the Supreme Court [in PLI-VA/ acknowledged that the dual holdings of Foster and /"PLIVA/ left the plaintiff there with no remedy, as she could not successfully bring a claim against name-brand manufacturers under Foster and ■was barred on other grounds from suing the generic manufacturers. [PLIVA ], [564 U.S. at-,] 131 S.Ct. at 2581 (acknowledging ‘the unfortunate hand that federal drug regulation has dealt’ plaintiff). The majority further stated that Congress or the FDA could change the law....”
857 F.Supp.2d at 1119-20 (emphasis added).
In an opinion issued not long after PLI-VA, a federal district court applied the law of our neighboring state of Florida:
“The vast majority of courts, in Florida and elsewhere, that have addressed the issue now before the Court have consistently held that consumers may not bring claims for negligence, fraud, strict liability, misrepresentation, or breach of warranty against a brand name pharmaceutical manufacturer when the consumers only ingested generic versions of the drug manufactured by third parties. [Numerous citations omitted.]
“Plaintiffs attempt to overcome the nearly unanimous adverse precedent by arguing that the Supreme Court’s decision in PLIVA Inc. v. Mensing, 564 U.S. -, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011), warrants a change in how Florida law is applied to producers of brand name pharmaceuticals. The thrust of Plaintiffs’ argument is that the Fourth Circuit’s holding in the seminal case of Foster v. American Home Products Corp., 29 F.3d 165 (4th Cir.1994), was based on the proposition (discussed in dicta) that consumers could recover from generic manufacturers for misrepresentations relating to their products. Id. at 170. While it is true that this proposition was rejected by the Supreme Court in [PLIVA], this proposition was by no means central to the ultimate holding in Foster. The Fourth Circuit’s holding in Foster was based on its interpretation of Maryland law *700 and the general rule that one manufacturer cannot be held liable on a negligent misrepresentation theory for injuries caused by another manufacturer. Id. In fact, the Foster court held that, irrespective of whether consumers could recover from generic drug manufacturers, a brand name manufacturer simply had no duty of care to individual consumers that did not use the named brand manufacturer’s product. Id. at 171.”
Metz v. Wyeth LLC, 830 F.Supp.2d 1291, 1293-94 (M.D.Fla.2011) (emphasis added).[32]

This Court’s Opinion

In addition to dozens upon dozens of cases from other jurisdictions directly addressing the issue before us, Wyeth cites four Alabama cases for the proposition that a duty arising from a relationship or nexus between the parties is necessary: Keck v. Dryvit Systems, Inc., 830 So.2d 1 (Ala.2002); State Farm v. Owen, 729 So.2d 834 (Ala.1998); DiBiasi v. Joe Wheeler Electric-Membership Corp., 988 So.2d 454 (Ala.2008); and Thompson-Hayward Chemical Co. v. Childress, 277 Ala. 285, 169 So.2d 305 (1964). The main opinion responds to these four cases by stating: “These cases are easily distinguishable from this case. Here, Wyeth authored the label with its warnings, and the generic manufacturers, as required by FDA regulations, copied that label verbatim.” 159 So.3d at 675. The fact that the generic manufacturer’s label must contain the same information as the label published by Wyeth, the name-brand manufacturer, is true, but that fact does not make the present case distinguishable from the four cases cited.
In each of those four cases, it was foreseeable that the plaintiff would be injured by the tortious conduct of the defendant. Despite this foreseeability, each of those cases was decided based on the fact that the alleged tortfeasor had no relationship or nexus with the plaintiff giving rise to a duty to the plaintiff.
Likewise, and admittedly without question given the federal regulatory scheme for generic drugs, it was foreseeable that a generic drug might one day be produced and that, if it was, it would replicate any deficiency in Wyeth’s brand-name drug, including its labeling, that might have been approved by the FDA. As was true in each of those other cases, however, such foreseeability, no matter how clear, simply is not all that is required. There was no liability in those four cases because the defendant did not have the requisite relationship or nexus with the injured party. Because the same is true here, those cases *701 are not distinguishable, but instead support Wyeth’s position.[33]
The main opinion concludes its analysis by quoting a passage from a 1998 opinion of the Court of Civil Appeals in Carter v. Chrysler Corp., 748 So.2d 456 (Ala.Civ.App.1998), which, in turn, quotes a 1994 decision of the Alabama Supreme Court, Hines v. Riverside Chevrolet-Olds, Inc., 655 So.2d 909, 919-20 (Ala.1994). As a threshold matter, I find the premise of the analysis quoted from Hines circular and confusing: “ ‘ “The extent of a legal duty not to make a false representation or to suppress a material fact informs our analysis of whether two parties have a sufficient relationship on which to base a duty to disclose.” ’ ” 159 So.3d at 675 (emphasis added). This passage essentially says that “the extent of a legal duty” will determine whether there is enough of a relationship on which “to base a duty.”
Leaving aside the circularity of its premise, Hines does state that “the fact that two parties have had no contractual relationship or other dealings does not preclude the finding of a legal duty not to make a material misrepresentation or to suppress a material fact.” 655 So.2d at 920. It adds, however, that “whether a duty to disclose exists must be determined by examining the particular facts of each case.” Id.
Hines did not involve an attempt to hold a manufacturer hable for injuries where the plaintiff has not used a product manufactured ' or sold by the defendant. Instead, Hines is a classic “privity” case. The question presented and addressed in Hines is whether the lack of a contract or other direct dealing between the plaintiff and the defendant — lack of privity — prevents the plaintiff from suing the defendant to recover for personal, or bodily, injuries. It is critical to a proper perspective of the Hines decision to note that the injury litigated in that case resulted from the plaintiffs use of the defendant’s product.
Carter v. Chrysler and the cases cited in Hines address the same question as did Hines.[34] In accordance with the movement of American jurisprudence in the last century away from a privity-based model for recovery for personal injuries, Hines and those other cases found privity to be unnecessary for a claim based on personal injuries. The lack of privity in those cases *702 does not mean, however, that there was not a “relationship,” or nexus, between the plaintiff and the defendant arising out of the fact that the plaintiff was injured by the defendant’s product; there was. There is not here.
Ultimately, the main opinion is inextricably grounded on a single notion: The foreseeability of a deficiency in a brand-name drug, including its labeling, being replicated in a generic drug, including its labeling, is so great that we must recognize a duty owing from the brand-name manufacturer to whomever might be hurt by the deficiency in the generic drug. But the clear foreseeability upon which this notion is based has either been explicitly acknowledged or clearly understood by each of the scores of other federal and state courts that have addressed the issue we now address. Yet, essentially all of them reach a different conclusion than do we. They do so on the same ground that Professor Prosser implores us to remember: Foreseeability alone is not enough. See discussion, infra, citing W. Prosser, Law of Torts 708 (4th ed.1971). In the words of the main opinion,' therefore, I can reach no conclusion other than that the “ground” we plow today is “new.” And we are the only court in the nation plowing it.[35]

A “Mountain of Authority” and an “Overwhelming National Consensus”

Aside from the discussion of the four cases and Hines reviewed above, the discussion and rationale offered by the main opinion today on application for rehearing are essentially unchanged from those offered in the opinion on original submission. Therefore, it is noteworthy that, since that original decision, there have been another dozen or more decisions on this issue by federal and state courts around the country, including decisions by four federal courts of appeals, two of them weighing in for the first time. In addition, the United States Supreme Court has now denied cer-tiorari review in Demahy v. Schwarz Pharma, Inc., 702 F.3d 177 (5th Cir.2012), cert. denied, — U.S. -, 134 S.Ct. 57, 187 L.Ed.2d 25 (2013).[36] None of these courts have been persuaded by the rationale offered by this Court’s original opinion.
Among the courts that have not been persuaded by our original decision is the Court of Appeals for the Fifth Circuit, which has decided two additional cases reaffirming the sound rationale it first embraced in Demahy. See Lashley v. Pfizer, Inc., 750 F.3d 470 (5th Cir.2014); Del Valle v. Teva Pharm. USA Inc., 750 F.3d 470 (5th Cir.2014) (consolidated cases).
Likewise, the Court of Appeals for the Eighth Circuit has decided yet another case reaffirming its position. In Bell v. Pfizer, Inc., 716 F.3d 1087 (8th Cir.2013), the Eighth Circuit held that, under Arkansas law, (i) the plaintiffs contention that *703 “her injuries were foreseeable” was “insufficient” to impose a duty on the brand-name defendants; (ii) that the plaintiff had to “show that a product manufactured or distributed by the brand[-name] defendants caused her injuries”; and (iii) that because the plaintiff “never used Reglan the brand[-name] defendants manufactured, [she] could not hold them liable under Arkansas law.” 716 F.3d at 1092-98. Further, the Eighth Circuit flatly rejected the plaintiffs suggestion that there was an “exception” to the “Arkansas product identification requirement” for “misrepresentation and fraud.” Id.
Recent appellate court decisions in Iowa are in accord. In Huck v. Trimark Physicians Group, 884 N.W.2d 82 (Iowa Ct.App.2013) (unpublished disposition), the Iowa Court of Appeals reaffirmed the settled, common-law rule that “ ‘a plaintiff in a products liability ease must prove that the injury-causing product was a product manufactured or supplied by the defendant.’ ” (Quoting Mulcahy v. Eli Lilly & Co., 386 N.W.2d 67, 76 (Iowa 1986).) Furthermore, much like decisions of this Court in the past, see, e.g., Pfizer, Inc. v. Farsian, 682 So.2d 405 (Ala.1996), the Huck court explained that plaintiffs who allege physical injuries caused by a product have, “regardless of the theory of liability” asserted, a products-liability claim that requires “product identification,” a requirement that cannot be circumvented by pleading claims of “strict liability, negligence, misrepresentation, breach of warranties,” and the like. See also note 31, supra.
Shortly before the release of the opinion in this case on rehearing, the Iowa Supreme Court vacated the decision of the Iowa Court of Appeals. It did so, however, in an opinion specifically rejecting this Court’s opinion on original submission in the present case and agreeing with the Iowa Court of Appeals’ position on the issue before us: “We adhere to [certain] bedrock principles ..., and join the multitude of courts that have concluded brand[name] defendants owe no duty to consumers of generic drugs.” Huck v. Wyeth, Inc., 850 N.W.2d 353, 380 (Iowa 2014) (also declining, in its words, “to step onto the slippery slope” that could lead to brand-name-manufacturer liability for harm caused by copies of other types of products manufactured by competitors).
Three of the federal courts of appeals that have addressed the issue since our opinion on original submission specifically acknowledge our decision. All three of them, the United States Courts of Appeals for the Sixth, Tenth, and Eleventh Circuits, rejected our reasoning. See Strayhorn v. Wyeth Pharm., Inc., 737 F.3d 378 (6th Cir.2013); Schrock v. Wyeth, Inc., 727 F.3d 1273 (10th Cir.2013); and Guarino v. Wyeth, LLC, 719 F.3d 1245 (11th Cir. 2013).[37] See also Metz v. Wyeth, LLC, 525 FedAppx. 893 (11th Cir.2013) (not published in F.3d). Two of those circuits, the Tenth Circuit and the Eleventh Circuit, have now weighed in for the first time.
Specifically, in Schrock v. Wyeth, the Court of Appeals for the Tenth Circuit joined all the other federal courts of appeals that have addressed the issue by declining to “impose a duty on drug manufacturers to warn of dangers in their competitors’ products” because the brand-name defendants “d[id] not have any rela *704 tionship with the [plaintiffs].” 727 F.3d at 1288. And in Guarino v. Wyeth, LLC, the Eleventh Circuit explained in no uncertain terms that there simply can be “no liability when we know with certitude that a given manufacturer did not produce the allegedly dangerous product.” 719 F.3d at 1251.
This Court continues to stand alone as the only appellate court in the country to hold that a brand-name manufacturer may be responsible for injuries caused to a party who ingests a generic drug that the brand-name manufacturer did not manufacture or sell. According to Wyeth, over 90 cases (a figure that includes trial courts) have now been decided in 25 states, including every state that borders Alabama, the federal circuit court that encompasses Alabama, and all six federal courts of appeals to have considered the issue. With the exception of two or three federal district court decisions already identified, all of them disagree with the position taken by this Court.
If the cases that decide the issue differently than we do were not logical and well reasoned, if they were not based on time-tested, bedrock legal principles, or if they did not resolve all the alleged distinctions between prescription-drug cases and other types of cases that have been raised in the main opinion and in the special concurrence, then perhaps their sheer number would not matter. But they are all these things.
The Eleventh Circuit Court of Appeals has put it this way:
“Our conclusion is fortified by the fact that the overwhelming national consensus — including the decisions of every court of appeal and the vast majority of district courts around the country to consider the question — is that a brand-name manufacturer cannot be liable for injuries caused by the ingestion of the generic form of a product. See, e.g., Bell v. Pfizer, Inc., 716 F.3d 1087, No. 12-1674 (8th Cir. June 14, 2013) (rejecting negligence, misrepresentation, and fraud claims against the brand manufacturer of metoclopramide, and explaining that ‘[a]n overwhelming majority of courts considering this issue ... have rejected [plaintiffs] theory of liability’ (internal quotation marks omitted)); Demahy v. Schwarz Pharma, Inc., 702 F.3d 177, 182-83 (5th Cir.2012) (per cu-riam), petition for cert. filed, 81 U.S.L.W. 3519 (U.S. Mar. 7, 2013) (No. 12-1093); Smith [v. Wyeth, Inc.], 657 F.3d [420] at 423-24 [(6th Cir.2011)] (‘The plaintiffs’ argument — that the name-brand defendants’ liability stems from the fact that the regulatory structure governing name-brand and generic drugs makes it foreseeable that patients and their physicians will rely on the name-brand labels to use and prescribe generic drugs — has been rejected by all but one of the courts that have considered it.’); Mensing [v. Wyeth, Inc.], 658 F.3d [867] at 867 [ (8th Cir.2011) ] (expressly reinstating the portion of the opinion holding that brand-name manufacturers cannot be held liable under Minnesota law for damage caused by generic drugs); Foster v. Am. Home Prods. Corp., 29 F.3d 165, 170-71 (4th Cir.1994); Gardley-Starks v. Pfizer, Inc., 917 F.Supp.2d 597 (N.D.Miss. Jan. 10, 2013) (‘The Court concludes that Mississippi law, consistent with the vast majority of courts to consider this issue, would not recognize a cause of action— however styled — against a brand manufacturer for injuries caused by use of its competitors’ generic product.’); see also id. at [604] n. 4 (noting the defendants’ citation to ‘sixty-six decisions applying the law of twenty-three different jurisdictions holding that brand-name manufacturers of a drug may not be held *705 liable under any theory for injuries caused by the use of a generic manufacturer’s product’). But see Kellogg v. Wyeth, 762 F.Supp.2d 694, 708-09 (D.Vt. 2010); Wyeth, Inc. v. Weeks, No. 1101897 (Ala. Jan. 11, 2018), reh’g granted (June 13, 2013); Conte v. Wyeth, Inc., 168 Cal.App.4th 89, 85 Cal.Rptr.3d 299, 310 (2008). Although only the law of Florida controls the outcome here, the cases denying recovery to plaintiffs bringing claims identical to those we confront in this case are legion, and this mountain of authority steels us in our determination that Florida law does not recognize a claim against the brand manufacturer of a prescription drug when the plaintiff is known to have consumed only the generic form.”
Guarino, 719 F.3d at 1252-53 (emphasis added).
The bedrock principles of tort law in this State are no different than the bedrock principles of tort law in every other state in this country, including the two dozen states whose laws have been considered in what the Eleventh Circuit call an “overwhelming national consensus.” There is no reason for this State not to be part of that consensus.[38]
III.
One of the many amici curiae briefs supporting Wyeth asserts, with supporting authority:
“Developing a prescription drug and taking it to market is a monumental undertaking. On average, it requires more than seven years and almost $2 billion to develop a single drug, obtain FDA approval for it, and bring it to market. ‘Name brand manufacturers undertake the expense of developing pi *706 oneer drugs, performing the studies necessary to obtain premarketing approval, and formulating labeling information.’ Foster [v. American Home Products Corp.], 29 F.3d [165] at 170 [ (4th Cir.1994) ].
“Brand-name manufacturers make research and development decisions against a particular legal backdrop. Under traditional tort principles, the brand-name manufacturer knows that it can be held responsible for injuries caused by its products under certain circumstances. See Wyeth v. Levine, 555 U.S. 555 (2009). The brand-name manufacturer also knows, however, that it will not be held liable for injuries caused by products that it neither made nor distributed. See, e.g., Foster, 29 F.3d at 168,171.
“... [T]he Plaintiffs’ novel liability theory would retroactively frustrate legitimate investment-backed expectations. Decisions were made and capital invested decades ago to produce a drug for sale in a legal system that (as is traditional) allows recovery for injuries caused by the brand-name company’s own product, but not for injuries caused by the products made by its competitors. The abrupt change that the Plaintiffs seek would wipe away that system and replace it with bet-the-company uncertainty.
“[Looking forward], Plaintiffs’ theory would destroy the predictability needed by brand-name manufacturers trying to decide whether to invest almost $2 billion and seven years of time to develop a new drug....”
Brief of amici curiae, The Chamber of Commerce of the United States of America and the Business Council of Alabama, at 20-24 (emphasis in original; some citations omitted).
Even proponents of the result urged by the plaintiffs admit that such a result is unfair to the brand-name manufacturers. See, e.g., Allen Rostron, Prescription for Fairness: A New Approach to Tort Liability of Branch-Name and Generic Drug Manufacturers, 60 Duke L.J. 1123, 1181 (Feb.2011) (admitting that “[u]nder the [approach of the California appeals court in] Conte [39] if a drug lacks adequate warnings, its brand-name manufacturer may wind up being liable for harm to those who took either the brand-name or the generic version of the drug, whereas the generic manufacturers likely will wind up not being liable to anyone. That asymmetry is particularly unfair given that the brand-name manufacturers make substantial investments in developing new drugs from which generic producers profit by copying.”); Wesley E. Weeks, Picking Up the Tab for Your Competitors: Innovator Liability After PLIVA, Inc. v. Mensing, 19 Geo. Mason L.Rev. 1257, 1259 (Summer 2012) (conceding that holding brand-name manufacturers liable “is far from ideal. The brand-name manufacturer invests resources to produce helpful pharmaceuticals, and under innovator liability, it would be liable for harm caused by its competitors’ drugs. As this reduces the profitability of creating new drugs, it could provide drug developers with a negative incentive, reducing the number of beneficial drugs developed in this country. Meanwhile, generic drug manufacturers are insulated from failure-to-warn lawsuits by the preemption recognized in [PLIVA].”).
Another concern is insurability:
“[G]iven the near impossibility of formulating bulletproof labeling, insurability represents a concern: cost spreading *707 would further burden the shrinking share of customers for the brand-name drug (or else later patients taking unrelated drugs produced by that defendant) for the benefit of customers of the competitor’s drug (who are already free riding on the original research and development efforts of the brand-name manufacturer). This threatens to chill therapeutic product innovation....”
Lars Noah, Adding Insult to Injury: Paying for Harms Caused by a Competitor’s Copycat Product, 45 Tort Trial & Ins. Prac. L.J. 673, 695 n. 69 (2010).
All of these concerns are elevated by the realization that there will be no correlation between the brand-name manufacturer’s continued participation in the marketplace with its own drug and its responsibility for generic drugs manufactured and sold by others. Under the rationale urged by the plaintiffs, and accepted by the majority of the Court today, a brand-name manufacturer’s complete departure from the marketplace would offer no logical reason for terminating its responsibility for the deficiencies in the labeling associated with generic versions of its drugs that may be marketed indefinitely thereafter by its former competitors and perhaps even new entrants into the market.[40] At least one commentator has noted that this is a distinct possibility. See Noah, 45 Tort Trial & Ins. Prac. L.J. at 691-92 (noting as an example Hoffmann-La Roche’s recent decision to withdraw its much litigated drug Accutane from the market and observing that, “[a]s a regulatory matter, so long as FDA does not withdraw the innovator’s NDA [new drug approval] on safety or effectiveness grounds, existing (and the possibility for future) ANDAs [abbreviated new drug approvals] would remain unaffected”).
Finally, and most troubling, I see no principled barrier to the extension of the “foreseeability” doctrine to deficient representations or design defects made by developers of other types of popular products copied by competitors. See, e.g., Huck v. Wyeth, supra. The line drawn today between the prescription-drug industry and all other industry exists only because we say it does; it will continue to exist only for so long as we say it does. There may be differences in the degree of foreseeability, but if foreseeability without relationship is to be the test, the line between the prescription-drug industry and other industry is arbitrary, and there is no principle to which this or other courts may anchor themselves in an effort to hold that line.[41]
Again, however, even if somehow this Court could guarantee that the “foreseeability” analysis embraced today never finds its way into cases involving other products or endeavors, either in this jurisdiction or in others, the potential deleterious effect on the prescription-drug indus *708 try and those that depend upon it provide more than enough concern. In a 1977 case in which a federal court in New York explained that the fact that it was foreseeable that a statement might be relayed to and relied upon by a party with whom the maker had no relationship was not sufficient to create a duty to that party. In so doing, the court heeded the concerns of none other than Professor Prosser:
“[W]here misstatements are claimed to be the cause of loss, even a ‘reasonable anticipation that the statement will be communicated to others whose identity is unknown to the defendant, or even knowledge that the recipient intends to make some commercial use of it in dealing with unspecified third parties, is not sufficient to. create a duty of care towards them.’ W. Prosser, Law of Torts, 708 (4th ed.1971). The reason for such a rule is obvious. To quote Prosser again, it is required in order to avoid ‘[t]he spectre of unlimited liability, with claims devastating in number and amount crushing the defendant because of a momentary lapse from proper care....’ Id.”
Demuth Dev. Corp. v. Merck & Co., 432 F.Supp. 990, 993-94 (E.D.N.Y.1977). We too should heed Professor Prosser’s concerns.
The investment and innovation that over the past 50 years have resulted in the fastest pace of medical advances in human history have depended upon the incentives made available by America’s free-market system. As they have for all types of products, the free-market system and the legal framework in which it has operated have coupled the risks and rewards of developing and distributing new medicines and, in so doing, have allowed entrepreneurs and innovators to assume both in corresponding measure. We now disrupt this critical dynamic.

. The Federalist No. 7, at 63 (Alexander Hamilton) (Clinton Rossitered., 1961).

. There has been criticism of the notion that foreseeability should be understood as significant in determining duty. Some courts and commentators have attempted to explain that foreseeability that a given act will lead to a given harm goes only to the issue whether that act is unreasonable and thus falls short of the standard of care or to the issue whether the harm can be considered to have been proximately caused by the act. They view the existence vel non of a duty as a threshold issue determined solely by the relationship or nexus of the parties. See, e.g., Gipson v. Kasey, 214 Ariz. 141, 144, 150 P.3d 228, 231 (2007) ("[FJoreseeability often determines whether a defendant acted reasonably under the circumstances or proximately caused injury to a particular plaintiff.... Foreseeability, as this Court noted in Martinez [v. Woodmar IV Condos. Homeowners Ass’n, Inc., 189 Ariz. 206, 211, 941 P.2d 218, 223 (1997)], is more properly applied to the factual determinations of breach and causation than to the legal determination of duty.”); W. Jonathan Cardi, Purging Foreseeability, 58 Vand. L.Rev. 739 (April 2005).
It is not necessary here to grapple with this fundamental question. It is enough for present purposes to recognize that foreseeability alone is not enough to create a duty and that a relationship between the parties is essential.

. My count might be low. An appendix to the appellants’ application for rehearing lists more cases.

. The following pre-PLTVA cases involve the same drug at issue in this case; many of them involve one or both of the same corporate defendants. In all of them, the court holds that the defendant brand-name manufacturer has no duty or liability with respect to generic metoclopramide not manufactured or sold by it: Mensingv. Wyeth, Inc., 588 F.3d 603, 612-14 (8th Cir.2009), rev’d in part on other grounds sub nom. PLIVA, Inc. v. Mensing, 564 U.S. -, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011); Bell v. Pfizer Inc., No. 5:10CV00101 BSM (E.D.Ark. Mar. 16, 2011) (not reported in F.Supp.2d); Overton v. Wyeth, Inc., No. CA 10-0491-KD-C (S.D.Ala. Mar. 15, 2011) (not reported in F.Supp.2d), findings and recommendation adopted (S.D.Ala. Apr. 7, 2011) (not reported in F.Supp.2d); Simpson v. Wyeth, Inc., No. 7:10-cv-01771-HGD (N.D.Ala. Dec. 9, 2010) (not reported in F.Supp.2d), report and recommendation adopted (N.D.Ala. Jan..4, 2011) (not reported in F.Supp.2d); Gross v. Pfizer, Inc., No. 10-CV-00110-AW (D.Md. Nov. 9, 2010) (not reported in F.Supp.2d); Cooper v. Wyeth, Inc., No. 09-CV-929 (M.D.La. Oct. 26, 2010) (not reported in F.Supp.2d); Fullington v. Pfizer, Inc., No. 4:10CV00236 JLH (E.D.Ark. Sept. 17, 2010) (not reported in F.Supp.2d); Johnson v. Teva Pharm. USA, Inc., No. 2:10 CV 404 (W.D.La. Aug. 16, 2010) (not reported in F.Supp.2d); Fisher v. Pelstring, No. 4:09-cv-00252-TLW (D.S.C. July 28, 2010) (not reported in F.Supp.2d); Neal v. Teva Pharm. USA, Inc., No. 09-CV-1027 (W.D.Ark. July 1, 2010) (not reported in F.Supp.2d); Mosley v. Wyeth, Inc., 719 F.Supp.2d 1340 (S.D.Ala.2010); Phelps v. Wyeth, Inc., No. 09-6168-TC (D.Or. May 28, 2010) (not reported in F.Supp.2d), findings and recommendation adopted (D. Or. June 21, 2010) (not reported in F.Supp.2d); Craig v. Pfizer, Inc., No. 3:10-00227 (W.D.La. May 26, 2010) (not reported in F.Supp.2d); Finnicum v. Wyeth, Inc., 708 F.Supp.2d 616, 619-21 (E.D.Tex.2010); Howe v. Wyeth Inc., No. 8:09-CV-610-T-17 AEP (M.D.Fla. Apr.26, 2010) (not reported in F.Supp.2d); Hardy v. Wyeth, Inc., No. 9:09CV152 (E.D.Tex. Mar. 8, 2010) (not reported in F.Supp.2d), report and recommendation adopted (E.D.Tex. Mar. 29, 2010) (not reported in F.Supp.2d); Couick v. Wyeth, Inc., 691 F.Supp.2d 643, 645-46 (W.D.N.C.2010); Levine v. Wyeth Inc., 684 F.Supp.2d 1338, 1344-48 (M.D.Fla.2010); Washington v. Wyeth, Inc., No. 3:09-CV-01343 (W.D.La. Feb. 8, 2010) (not reported in F.Supp.2d); Morris v. Wyeth, Inc., No. 09-0854 (W.D.La. Nov. 23, 2009) (not reported in F.Supp.2d); Meade v. Parsley, No. 2:09-cv-00388 (S.D.W.Va. Nov. 13, 2009) (not reported in F.Supp.2d); Burke v. Wyeth, Inc., No. G-09-82 (S.D.Tex. Oct. 29, 2009) (not reported in F.Supp.2d); Stoddard v. Wyeth, Inc., 630 F.Supp.2d 631, 633-34 (E.D.N.C.2009); Fields v. Wyeth, Inc., 613 F.Supp.2d 1056, 1060-61 (W.D.Ark.2009); Moretti v. Wyeth, Inc., No. 2:08-cv-00396-JCM-(GWF) (D.Nev. Mar. 20, 2009) (not reported in F.Supp.2d); Schrock v. Wyeth, Inc., 601 F.Supp.2d 1262, 1266-67 (W.D.Okla.2009); Cousins v. Wyeth Pharm., Inc., No. 3:08-CV-0310-N (N.D.Tex. Mar. 10, 2009) (not reported in F.Supp.2d); Smith v. Wyeth, Inc., No. 5:07-CV-18-R (W.D. Ky. June 30, 2008) (not reported in F.Supp.2d), aff’d, 657 F.3d 420 (6th Cir. 2011); Wilson v. Wyeth, Inc., No. 3:07-CV-378-R (W.D. Ky. June 30, 2008) (not reported in F.Supp.2d), aff'd, 657 F.3d 420 (6th Cir. 2011); Morris v. Wyeth, Inc., No. 1:07-CV-176-R (W.D. Ky. June 30, 2008) (not reported in F.Supp.2d), aff’d, 657 F.3d 420 (6th Cir. 2011); Pustejovsky v. Wyeth, Inc., No. 4:07-CV-103-Y (N.D.Tex. Apr. 3, 2008) (not reported in F.Supp.2d); Swicegood v. PLTVA, Inc., 543 F.Supp.2d 1351, 1358 (N.D.Ga.2008); Tarver v. Wyeth, Inc., No. Civ.A.3-04-2036 (W.D.La. Jan. 26, 2006) (not reported in F.Supp.2d); Tarver v. Wyeth, Inc., No. Civ. A.3-04-2036 (W.D. La. June 7, 2005) (not reported in F.Supp.2d); Block v. Wyeth, Inc., No. Civ.A. 3:02-CV-1077 (N.D.Tex. Jan. 28, 2003) (not reported in F.Supp.2d); and Sharp v. Leichus, 952 So.2d 555 (Fla.Dist.Ct.App.2007).
In addition to Foster, the other pre-PLIVA cases holding that a manufacturer of a brand-name drug has no duty or liability to the consumer of a generic drug manufactured and sold by another company include Bam- *691 hill v. Teva Pharmaceuticals USA, Inc., No. 06-0282-CB-M (S.D.Ala. Apr. 24, 2007) (not reported in F.Supp.2d); Leblanc v. Wyeth, Inc., No. CIV A 04-0611 (W.D.La. Oct. 5, 2006) (not reported in F.Supp.2d); Goldych v. Eli Lilly & Co., No. 5:04-CV-1477 (GLS/GJD) (N.D.N.Y. July 19, 2006) (not reported in F.Supp.2d); Colacicco v. Apotex, Inc., 432 F.Supp.2d 514, 540-41 (E.D.Pa.2006), rev’d on other grounds, 521 F.3d 253 (3d Cir.2008), vacated and remanded, 556 U.S. 1101, 129 S.Ct. 1578, 173 L.Ed.2d 672 (2009); Possa v. Eli Lilly & Co., No. 05-1307-JJB-SCR (M.D.La. May 10, 2006) (not reported in F.Supp.2d); Stanley v. Wyeth, Inc., 991 So.2d 31, 34-35 (La.Ct.App.2008); and Flynn v. American Home Products Corp., 627 N.W.2d 342, 350 (Minn.Ct.App.2001).
In addition, according to briefs filed in this case, two Alabama circuit courts also have addressed the issue of liability for injuries allegedly caused by generic metoclopramide, both concluding that the brand-name manufacturer was not liable for injury caused by the generic drug manufactured and sold by another company. See Buchanan v. Wyeth Pharm., Inc., No. CV-2007-900065, Oct. 20 2008; Green v. Wyeth, Inc., No. CV-2006-3917, May 14, 2007.

. See Weeks v. Wyeth, No. l:10-cv-602-MEF (M.D.Ala. Mar. 31, 2011) (not reported in F.Supp.2d); Conte v. Wyeth, Inc., 168 Cal. App.4th 89, 85 Cal.Rptr.3d 299, 315-18 (2008); and Kellogg v. Wyeth, 762 F.Supp.2d 694 (D.Vt.2010).

. See also, e.g., Tetuan v. A.H. Robins Co., 241 Kan. 441, 464, 738 P.2d 1210, 1228 (1987) ("[WJhere a patient relies on a physician for treatment or advice ..., justifiable reliance by the physician on misrepresentations or concealment by the manufacturer of [a] device constitutes justifiable reliance by the patient.”); Reyes v. Wyeth Labs., 498 F.2d 1264, 1276 (5th Cir.1974) (“Pharmaceutical companies then, who must warn ultimate purchasers of dangers inherent in patent drugs sold over the counter, in selling prescription drugs are required to warn only the prescribing physician, who acts as a ‘learned intermediary’ between manufacturer and consumer.”); and Lovejoy v. AT & T Corp., 92 Cal.App.4th 85, 95, 111 Cal.Rptr.2d 711, 718 (2001) ("Under the principle of indirect reliance, a fraudulent misrepresentation is actionable if it was communicated to an agent of the plaintiff and was acted upon by the agent to the plaintiff’s damage. A classic example of indirect reliance would be a drug manufacturer’s misrepresentation to physicians about the safety of its drug. A patient injured by the drug is permitted to sue the manufacturer for fraud without proof that his doctor repeated the falsehood to him, under the theory that the doctor was acting as plaintiff’s agent.”).

. Of course, the corollary of this fact is that the generic manufacturer does have a duty to the consumer of its generic drug to publish a label upon which that consumer, through his or her physician or pharmacist, can rely. It does not change the lack of a duty by the brand-name manufacturer as to the manufacturer of the generic drug to say that the generic manufacturer must replicate for use with its own drug the wording of the dosing instructions and warnings approved by the FDA for use by the brand-name manufacturer. That fact, and whatever effect it may or may not have upon the generic manufacturer's liability to its consumer, is .a matter between the generic manufacturer and the consumer, with "input” from Congress, the FDA, and the United States Supreme Court. The brand-name manufacturer plays no role in the generic manufacturer's decision to enter the market, and it is not responsible for crafting the regulatory and legal framework within which the generic manufacturer chooses to do so.

. These cases take this approach because pharmacological defects and defective warnings are indistinguishable for purposes of considering liability associated with the consumption of a drug. As the United States Supreme Court recently explained in a non-drug case:
"According to petitioners, these claims do not fall within the [Locomotive Inspection Act’s] pre-empted field because '[t]he basis of liability for failure to warn ... is not the “design” or "manufacture” of a product,' but is instead 'the failure to provide adequate warnings regarding the product’s risks.’ ...
“We disagree. A failure-to-wam claim alleges that the product itself is unlawfully dangerous unless accompanied by sufficient warnings or instructions. Restatement (Third) of Torts: Products Liability § 2(c) (1997) (A failure-to-warn claim alleges that a product is defective 'when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distributor, ... and the omission of the instructions or warnings renders the product not reasonably safe ’); see also id., Comment l, at 33 (‘Reasonable designs and instructions or warnings both play important roles in the production and distribution of reasonably safe products’).”
Kurns v. Railroad Friction Prods. Corp., — U.S. -, -, 132 S.Ct. 1261, 1268, - L.Ed.2d-(2012) (emphasis added).
The indistinguishability of labeling and product is even clearer — and more tangible— in the case of prescription drugs. Prescription drugs are approved for sale by the FDA as safe and effective only for use as recommended in the approved labeling. As an ami-cus brief in another case recently explained:
"Attempts to selectively untether the design of a prescription drug from its labeling by allowing a claim that 'the drug’s risks outweighed its benefits' making it unreasonably dangerous ignore one very salient fact: The FDA-approved ‘benefit’ is derived only by reference to the approved indications in the product labeling, and the source of the 'risks’ to which the benefits *695 are compared also is the FDA-approved labeling. In other words, a pharmaceutical product cannot he divorced from its label as it is not possible to conduct a risk/benefit (i.e., design defect) evaluation without the product labeling.”
Brief of the Generic Pharmaceutical Association as amicus curiae in support of the petitioner in Mutual Pharm. Co. v. Bartlett, No. 12-142, Jan. 22, 2013, p. 16 (appellate brief to United States Supreme Court 2013) (emphasis added). See also note 31, infra. Indeed, the United States Supreme Court in PLIVA itself treated the label and warnings that accompanied the drug as an integral part of the drug itself. Adequate warnings, or lack thereof, are an inseparable part of the product purchased and consumed by the plaintiff. (No one, for example, would contend that Tylenol brand acetaminophen sold to consumers as a pain remedy, but without any labels prescribing dosages or warning of the harmful side effects of taking more than the prescribed dosage would amount to the same product as Tylenol sold with a label prescribing a dosage of only two tablets every six hours and warning of harmful side effects if that dosage is exceeded.)
Even this Court has had occasion to express its understanding that the dosing instructions and the warnings of contraindications and side effects set out in a drug’s label make the drug what it is. In Stone v. Smith, Kline & French Lab., 447 So.2d 1301, 1304 (Ala. 1984), this Court analyzed a "failure to warn” as an aspect of products-liability law, and explained that "the adequacy of the accompanying warning determines whether the drug, as marketed, is defective, or reasonably dangerous.”

. In Wyeth v. Levine, 555 U.S. 555, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009), the Supreme Court held that lawsuits against brand-name manufacturers of prescription drugs were not preempted by federal law.

. See Demahy v. Schwarz Pharma, Inc., 702 F.3d 177 (5th Cir.2012); Smith v. Wyeth, Inc., 657 F.3d 420 (6th Cir.2011); Mensing v. Wyeth, Inc., 658 F.3d 867 (8th Cir.2011); Baymiller v. Ranbaxy Pharm., Inc., 894 F.Supp.2d 1302 (D.Nev.2012); Strayhorn v. Wyeth Pharm., Inc., 882 F.Supp.2d 1020 (W.D.Tenn.2012); Phelps v. Wyeth, Inc., 857 F.Supp.2d 1114 (D.Or.2012); Metz v. Wyeth LLC, 830 F.Supp.2d 1291 (M.D.Fla.2011); Lashley v. Pfizer, Inc., 877 F.Supp.2d 466 (S.D.Miss.2012); Guarino v. Wyeth LLC, No. 8:10-cv-2885-T-30GTW (M.D.Fla. Apr. 3, 2012) (not reported in F.Supp.2d); Gross v. Pfizer, Inc., No. 10-CV-00110-AW (D.Md. Sep. 7, 2011) (not reported in F.Supp.2d); and Fullington v. PLIVA, Inc., No. 4; 10CV00236JLH (E.D.Ark. Dec. 12, 2011) (not reported in F.Supp.2d). Some of these are cases in which a court that addressed the issue before PLIVA had an opportunity after PLIVA to revisit its previous ruling, only to reaffirm that previous ruling and implicitly or explicitly conclude that the Supreme Court’s holding in PLIVA did not alter the court's pre-PLIVA analysis.

.The court explained that the term "products liability action” was simply a reference to " ‘any action brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formulation ... warn *697 ing, instructing, marketing, advertising, packaging or labeling of any product.’ " 657 F.3d at 423 (quoting Ky.Rev.Stat. § 411.300(1) (2010)).
Cases from jurisdictions decided under a legislatively, or in some cases judicially, crafted "products liability doctrine” that has supplanted or supplemented traditional common-law theories of recovery are entirely apposite to the question at hand. Such doctrines, as in Kentucky, invariably reflect common-law theories of recovery, including misrepresentation and suppression relating to labeling and warnings, and, like the common-law claims alleged here, also require the existence of a duty arising out of a sufficient nexus between the manufacturer and consumer in relation to the product consumed.
For the same reason, it is not necessary to address the issue whether the claims made by the plaintiffs in this case should be considered Alabama Extended Manufacturer’s Liability Doctrine claims or may be considered conventional products-liability claims based on common-law theories of fraud and suppression. A duty arising from a relationship or nexus between the parties would be necessary in either case; none exists here.

. The Florida federal district court went on to explain that "many of the pre-[PLIVA ] decisions in Florida and elsewhere apparently assumed that consumers would have a remedy against generic drug manufacturers" but that this assumption was not the basis for those decisions. 830 F.Supp.2d at 1294.
As did the Oregon federal court in Phelps v. Wyeth, supra, the federal district court in Metz explained how the opinion in PLIVA itself reveals the Supreme Court's understanding that its decision in PLIVA changed nothing as to the lack of a duty on the part of brand-name manufacturers with respect to those injured as a result of deficient labeling of other manufacturers’ products:
"Tellingly, the Supreme Court in [PLIVA ] appeared to contemplate that consumers of generic drugs may be without a remedy when it noted 'the unfortunate hand that federal drug regulation has dealt [consumers of generic drugs].’ [564 U.S. at -, 131 S.Ct.] at 2581; see [564 U.S. at ---, 131 S.Ct.] at 2592 (Sotomayor, J., dissenting)(noting that under the majority’s decision, a consumer of a generic drug ‘now has no right to sue’).”
830 F.Supp.2d at 1294.

. The problem in this case is that the relationship or nexus to which one would normally look as the basis for a duty exists between the consumer and the generic manufacturer. As discussed, see note 27, supra, one therefore would expect that it would be the generic manufacturer that would bear responsibility for the plaintiffs’ injuries. Nor would such an outcome be unfair. The generic manufacturer is not required to take on the manufacture or distribution of the generic drug. It does so freely, weighing the risks and rewards of manufacturing and selling a generic drug under whatever conditions are imposed by federal law. No one requires it to enter the market — not the federal government, and certainly not the brand-name manufacturer that developed the drug and that stands to lose market share and attendant profits if the generic manufacturer does enter the market. The generic manufacturer makes these decisions freely, knowing that when it seeks to profit from marketing a generic drug, certain risks come with that decision. It is not the fault of the brand-name manufacturer that the federal government has decided that the consumer of a competitor’s product is to be blocked from imposing on that competitor the costs that would normally accompany the rewards attendant to the sale of that product.

. “Johnny Spradlin Auto Parts, Inc. v. Cochran, 568 So.2d 738, 742-43 (Ala.1990); Lawyers Title Ins. Corp. v. Vella, 570 So.2d 578, 585 (Ala.1990); Hopkins v. Lawyers Title Ins. Corp., 514 So.2d 786 (Ala.1986); Mid-State Homes, Inc. v. Stanley, 366 So.2d 734 (Ala. Civ.App. 1979); Chandler v. Hunter, 340 So.2d 818 (Ala.Civ.App.1976). Cf. Sims v. Tigrett, 229 Ala. 486, 158 So. 326 (1934).’’ Carter v. Chrysler Corp., 743 So.2d at 461.

. The special concurrence states that "[n]o decision of any other jurisdiction addresses the precise question of Alabama law discussed . in our answer.” 159 So.3d at 678 (Shaw, J., concurring specially). Beginning with Poster, however, there has been an almost endless stream of published opinions discussed hereinafter that address the exact issue we address here: a claim of “fraud,” "suppression,” or “misrepresentation” in connection with a generic manufacturer’s use of deficient labeling in the "pervasively” regulated prescription-drug industry. And the fundamental legal principles employed in the analysis of this issue in these other cases are as elemental and imbedded in the law of this State as they are in the law of the other states discussed in those decisions.

. The Supreme Court previously had denied certiorari review in Smith v. Wyeth, Inc., 657 F.3d 420(6th Cir.2011), cert. denied,-U.S. -, 132 S.Ct. 2103, 182 L.Ed.2d 868 (2012).

. In each of these three cases, the federal Court of Appeals refers to this Court's decision on original submission as being one of only two or three that have held as it did. See, e.g., Guarino, 719 F.3d at 1253, citing in juxtaposition to the “mountain” of cases to the contrary, this court’s decision and the decisions of the Vermont district court in Kellogg v. Wyeth, 762 F.Supp.2d 694, 708-09 (D.Vt.2010), and the California district court in Conte v. Wyeth, Inc., 168 Cal.App.4th 89, 85 Cal.Rptr.3d 299, 310 (2008).

. The special concurrence characterizes the main opinion as simply applying “established Alabama decisions,” "established Alabama tort law” and "existing law," concluding that the main opinion therefore "epitomizes ... judicial restraint.” 159 So.3d at 681 (Shaw, J., concurring specially). For the reasons explained in this writing, however, existing Alabama precedents do not support the holding of this Court today. To the contrary, the decision of this Court today essentially stands alone against Alabama cases recognizing and applying the fundamental principles of relationship and duty discussed at length herein and against an unprecedented number (approaching 100 cases) from other jurisdictions applying the same fundamental principles specifically to the prescription-drug industry. As the Eleventh Circuit puts it, these latter cases do indeed constitute a "mountain of authority” representing an "overwhelming national consensus" to the contrary of the conclusion reached by this Court today.
As for the persistent suggestion that this "mountain of authority” somehow addresses some issue or issues different than the issue this Court addresses today, I can do little more than once again point the reader to the discussion of and the quotations from so many of the cases that are part of that "mountain,” as set out extensively on the several dozen pages that immediately precede this one. As already observed, beginning with Foster, most of this almost endless stream of precedents involves the exact issue addressed here, a claim of "fraud,” "suppression,” or “misrepresentation” in connection with a generic manufacturer’s use of deficient labeling in the "pervasively” regulated prescription-drug industry. And, again, the fundamental legal principles employed in the analysis of this issue in these other cases are as elemental to the law of this State as they are to the law of the states discussed in those decisions.
Finally, although I think it clear enough from the discussion that both precedes and follows this footnote, let me be explicit in stating that any discussion of economic or other practical concerns found herein is not offered out of a perceived need to supplant or to supplement the case authority cited. It is but to further explain the reason and soundness of that authority and, to that end, the ramifications generally and in regard to the prescription-drug industry in particular of an abandonment of the fundamental legal principles that inform that authority.

. Conte v. Wyeth, Inc., 168 Cal.App.4th 89, 85 Cal.Rptr.3d 299 (2008).

. In fact, one of the defendants in the case before us today, Wyeth, Inc., ceased manufacturing Reglan or making any representations concerning it in about 2002; it sold its right to produce the drug to codefendant Schwarz Pharma, Inc.

. Even the United States District Court for the Middle District of Alabama, in its order certifying to us the question at hand, agrees:
"[T]he question’s significance extends well beyond the Reglan litigation — and for that matter, even beyond pharmaceutical litigation. It is likely to recur any time a brand-name manufacturer (of any product) is sued on fraud, misrepresentation, and/or suppression theories by a plaintiff who claims to have been injured while using a generic-equivalent product.”
See also Alissa J. Strong, “But He Told Me It was Safe’’: The Expanding Tort of Negligent Representation, 40 U. Mem. L.Rev. 105, 142 (Fall 2009) (explaining that it is "not unreasonable to assume” that the Conte decision could be applied outside the drug context).